UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

LEGEND'S CREEK LLC,
JON RESTIVO, and
ADEN MOTT
     *Plaintiffs*

v.                                 C.A. No. 22-cv-309-JJM-PAS

THE STATE OF RHODE ISLAND, and
THE RHODE ISLAND DEPARTMENT OF
HEALTH
     *Defendants*

## **DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

     This Memorandum of Law supports the Rule 56 Motion for Summary Judgment filed by Defendant, the State of Rhode Island Department of Health ("RIDOH" or "Defendant"). Defendant moves for summary judgment on the remaining two counts in the Complaint filed in this civil action by Plaintiffs' Legends Creek Farm, LLC., Jon Restivo, and Aden Mott ("Plaintiffs"); per se physical taking in violation of the Fifth Amendment of the United States Constitution and regulatory taking. *See* SOF ¶ 5. The remaining two counts are unsupported by the facts in this case and should be dismissed. For these reasons fully explained below, Defendant respectfully requests that their Motion for Summary Judgment be granted.

# I.    FACTS AND BACKGROUND[1]

## A. Factual Background

Plaintiffs Jon Restivo and Aden Mott are married and formed the business Legends Creek Farm on March 16, 2012. See SOF ¶ 11. Legends Creek Farm was originally operated at 38A Hartford Pike, Foster, Rhode Island where both Restivo and Mott resided and operated the business. See SOF ¶ 12. In July 2014, Restivo and Mott purchased the property located at 27 Mill Road, Foster, Rhode Island, (the "property") for $396,750.00; the property at issue in this lawsuit.  See SOF ¶ 13. Plaintiffs purchased this property and moved the business here in hopes to reside on the property, operate Legends Creek Farm, and eventually operate a commercial kitchen to process and sell food. See SOF ¶ 14. In order to have a commercial kitchen on the property, Plaintiffs needed to apply for a public water supply permit from the Rhode Island Department of Health ("RIDOH") because existing wells on the property did not meet RIDOH requirements. See SOF ¶ 17.

On June 29, 2018, Plaintiffs filed an application for approval for a public water supply permit to RIDOH. See SOF ¶ 18. On October 5, 2018, after review of the application, RIDOH issued a letter to Plaintiffs denying their application. See SOF ¶ 19. This denial letter cites that within the wellhead protection area (1,750- foot radius around the well) there is a significant source of pollution; Wrights Auto Salvage Yard. See SOF ¶ 20. Prior to receiving a decision on the permit, Plaintiffs hired a company

---

[1] The summary of salient facts has been gleaned from the "Statement of Undisputed Facts" filed in support of this Motion for Summary Judgment.

to drill the proposed well and construction of the space where the commercial kitchen was intended to go. See SOF ¶ 27. On November 5, 2018, Plaintiffs submitted a written appeal of RIDOH's decision. See SOF ¶ 28. In response to Plaintiffs appeal, RIDOH issued a notice of hearing on July 17, 2019. See SOF ¶ 29. The hearing was held over the course of two days; March 5, 2020, and September 17, 2020. See SOF ¶30. A decision was issued by hearing officer and then adopted on December 3, 2020, upholding RIDOH's denial of the public water supply permit. *Id*. This twenty-eight page decision concluded that Wrights Auto Salvage Yard, an over 60 year old, 25 acre junkyard, that predated "licensing and hazardous waste statutes, was such a large and unknown junkyard with known and unknown contaminants that was in the regulatory recharge zone of 1,750 feet at 548 feet was a potential source of contamination through the bedrock so that there was no assurance of safe and potable drinking water for the public." See SOF ¶ 31. There was no evidence one way or the other to prove or disprove that there were contaminants coming from Wrights Auto Salvage Yard, or even how the water flowed underneath Wrights. See SOF ¶ 32. This junkyard was ultimately found to be too great of a public health concern for RIDOH to approve a public water supply on the Legends Creek neighboring property.

On December 29, 2020, Plaintiffs filed an administrative appeal to the Rhode Island Superior Court pursuant to § 42-35-15 of the Rhode Island Administrative Procedures Act. See SOF ¶ 33. At this time, Plaintiffs no longer owned and operated the property at 27 Mill Road or the business, Legends Creek. See SOF ¶ 34, 40. In May 2020, Restivo and Mott sold the business Legends Creek, LLC for $750,000.00.

See SOF ¶ 40. On January 19, 2021, Plaintiffs sold the property at 27 Mill Road for $804,000.00. See SOF ¶ 34. After briefing and a hearing, the Superior Court upheld RIDOH's decision based on lack of standing and denied Plaintiffs' administrative appeal. See SOF ¶ 35. In March 2021, Plaintiffs Restivo and Mott moved to Vermont, where they purchased property and currently operate a new business, Buster & Bellas, similar to the Legends Creek. See SOF ¶ 58-61.

## B. Procedural History and Operative Complaint

Plaintiffs filed their Amended Complaint on October 6, 2022; the operative complaint here. See SOF ¶ 1. Defendants then filed their Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. See SOF ¶ 2. Defendants Motion was partially granted, and Counts III, IV, V, and VI were dismissed, as well as state law claims in Count I and II. See SOF ¶ 3. Plaintiffs' remaining claims are,

**Count I**- Per Se Physical Taking Without Compensation by Imposition of Negative or Restrictive Easement in violation of the Fifth Amendment of the United States Constitution and;

**Count II**- Regulatory Taking Without Compensation.

See SOF ¶ 5. Plaintiffs allege in Count I that the denial of the public water supply permit was a physical per se taking that "constitutes the imposition of a negative or restrictive easement on the Mill Road Property in favor of the junkyard", greatly diminishing the market value of Legends Creek Farm and the Mill Road Property. See SOF ¶ 6, 7. Plaintiffs allege in Count II "Defendants refusal to permit Plaintiff

Legends Creek Farm to operate a public water supply well on its property because the adjoining junkyard might be polluting the ground water or water table constitutes a regulatory taking." See SOF ¶ 8.

## II. <u>LEGAL STANDARD</u>

Pursuant to Rule 56(C) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Morrissey v. Boston Five Cents Sav. Bank. F.S.B.,* 54 F.3d 27, 31 (1st Cir. 1995). In response, the Plaintiff "may not rest upon the mere allegations of denial of [his] pleadings, but … must set forth the specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "A fact is 'material' if it potentially could affect the suit's outcome. An issue concerning such a fact is 'genuine' if a reasonable fact finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, resolve the dispute in that party's favor." *Cortes-Iriszarry v. Corporation Insular DeSeguros*, 111 F.3d 184, 187 (1st Cir. 1997) (citation omitted).

Accordingly, the purpose of summary judgment is to permit the court "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required" on the claims being examined. *Wynne v. Tufts Univ. Sch. of Med.,* 976 F.2d 791, 793-94 (1st Cir. 1992) *cert. denied* 113 S.Ct. 1845 (1993). The nonmoving party is not at liberty to rebut with general denials. Rule 56(C)

requires entry of summary judgment "upon motion against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). Motions for summary judgment must be decided on the record as it stands, not on litigants' vision of what the facts might some day reveal. As the First Circuit has warned, "[b]rash conjecture, coupled with earnest hope that something concrete will eventually materialize, is insufficient to block summary judgment." *Dow v. United Bd. of Carpenters*, 1 F.3d 56, 58 (1st Cir. 1993).

### III.   ARGUMENT

### A.  Sovereign Immunity Has Not Been Waived. [2]

### 1.  Rhode Island Has Not Waived its Eleventh Amendment Immunity from a Federal Takings Claim.

"Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021).  Plaintiffs have brought a Section 1983 claim, which provides a federal cause of action against "[e]very person" who deprives another person "of any rights, privileges, or immunities secured by the Constitution

---

[2] Defendants brought this argument in its Motion to Dismiss, and it was denied by the Courts Order. ECF 18. Subsequent caselaw has come to Defendants attention and believes this argument should be revisited in summary judgment.

and laws." 42 U.S.C. §1983. "Basic tenants of sovereign immunity teach that courts may not ordinarily hear a suit brought by any person against a nonconsenting State." *Torres v. Texas Dept. of Public Safety,* 142 S. Ct 2455, 2461-62 (2022); *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989). There are two main exceptions to this doctrine: (1) "Congress may abrogate a state's sovereign immunity through 'appropriate legislation,'" *Davidson v. Howe*, 749 F.3d 21, 28 (1st Cir. 2014) (quoting *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011)); and (2) "a State may waive its sovereign immunity by consenting to suit," *id.* (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Edu. Expense Bd.*, 527 U.S. 666, 670 (1999)). Absent an applicable exception to sovereign immunity, Plaintiffs § 1983 claims must be dismissed.

In *Soscia Holdings, LLC v. Rhode Island*, 677 F. Supp. 3d 55, 66 (D.R.I. 2023), Plaintiff filed a Complaint against the State of Rhode Island and individually named State Defendant employees. Count II was a § 1983 claim alleging a taking by the State of Rhode Island in violation of the Takings Clause of the Fifth Amendment; seeking damages, a declaratory judgment and a permanent injunction. *See Soscia* at 66. This is a Rhode Island District Court case in which all of the judges in the District of Rhode Island were recused and the case was referred to the District of New Hampshire for assignment. See SOF ¶ 62.

On June 15, 2023, the Court in *Soscia* found that sovereign immunity under the Eleventh Amendment applied to the Takings claim against the State of Rhode Island. *See Soscia* at 73. "Section Five's grant of Congressional power to enforce the

Fourteenth Amendment's substantive provision permits such abrogation." *Ladd v. Marchbanks,* 971 F.3d 574, 578 (6th Cir. 2020) (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed. 614 (1976)). Notably, 42 U.S.C. § 1983 does not abrogate the States sovereign immunity. *Id.* (citing *Quern v. Jordan,* 440 U.S. 332, 342, 99 S.Ct. 1139, 59 L.Ed.2d. 358 (1979)). The Sixth Circuit has held that "the States sovereign immunity protects them from takings claims for damages in federal court." *DLX, Inc. v. Kentucky*, 381 F.3d 511, 526 (6th Cir. 2004) (overruled on other grounds). "[W]here the constitution requires a particular remedy, such as … through the Takings Clause as indicated in *First English*, the state is required to provide that remedy in its own courts, notwithstanding sovereign immunity." *Id.* (citing to *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 314, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987)). The First Circuit has also held that "damages actions against governmental entities stemming from land use policies were not cognizable in a federal court." *Citadel Corp. v. Puerto Rico Highway Authority*, 695 F.2d 31, 33 (1st Cir. 1982) (citing *Pamel Corp. v. Puerto Rico Highway Authority*, 621 F.2d 33 (1st Cir. 1980)).

This Honorable Court found that "Plaintiffs' takings claims in Count I and II allege actual violations of the Fourteenth Amendment and Fifth Amendment." See ECF 18 p. 5. Yet, this Court also found that "Plaintiffs did not have legitimate claim of entitlement to the public water supply permit" and dismissed Plaintiffs' claims under the Fourteenth Amendment. See ECF 18 at p. 12. The First Circuit in *Sinapi* held that "[n]o immunity protects states from a claim of monetary damages based on

'actual violations' of the Fourteenth Amendment." *See Sinapi v. Rhode Island Board of Bar Examiners*, 910 F.3d 544, 553 (1st Cir. 2018). The Court then looked to whether Sinapi alleged "sufficient facts to make out such an 'actual violation' of the Fourteenth Amendment." *Id*. The First Circuit concluded that the alleged violations of the Americans with Disabilities Act ("ADA"), did not constitute actual violations of the Fourteenth Amendment, and Eleventh Amendment Immunity applied. *See Id.* Just as the First Circuit held in *Sinapi*, the process received here also falls squarely within the basic constitutional requirements, as there was no actual violation of the Fourteenth Amendment as found by this Court. *See Id.* at 554.

"Where the court may not award monetary damages, summary dismissal is appropriate for that portion of the complaint." *Ortiz De Arroyo v. Barcelo,* 765 F.2d 275, 280 (1st Cir. 1985). Plaintiffs have not alleged an actual violation of the Fourteenth Amendment. The States have sovereign immunity from takings claims in federal court, so long as the states remain open to those claims. See *Pavlock v. Holcomb*, 35 F.4th 581, 589 (7th Cir.), <u>cert. denied,</u> 143 S. Ct. 374, 214 L. Ed. 2d 182 (2022). Eleventh Amendment Immunity applies to Plaintiffs' physical and regulatory takings claims and should be dismissed.

### B. <u>Plaintiffs cannot establish a violation of the Takings Clause.</u>

Assuming, *arguendo,* that Plaintiffs' Takings Clause Claims are properly before this Court, the State is entitled to summary judgment on Count I and II of the Amended Complaint as Plaintiffs have failed to satisfy the elements of a governmental taking.

"To plausibly allege an unconstitutional taking, the plaintiff must make a threshold showing 'that they possess a recognized property interest which may be protected by the Fifth Amendment.'" *Soscia Holdings, LLC v. Gray*, No. 22-CV-266-LM-AKJ, 2024 WL 1257023, at *10 (D.R.I. Mar. 25, 2024) (citing *In re Fin. Oversight & Mgmt. Bd. for P.R.,* 54 F.4th 42, 58 n.18 (1st Cir. 2022). "Assuming the plaintiff plausibly pleads a protect property interest, they must next show that they were deprived on that interest." *Id.* This deprivation may be in the form of a physical taking or a regulatory taking. *Id.* "Determining whether a taking is physical or regulatory is 'critical', because 'it often determines the level of scrutiny that a challenged government action will receive.'" *Id.* (citing *Me. Educ. Ass'n Benefits Tr. V. Cioppa*, 695 F.3d 145, 152 (1st Cir. 2013).

"When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 321, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). "Physical takings 'are relatively rare, easily identified, and usually represent a greater affront to the individual's property rights." *Id.* "A physical taking occurs either when there is condemnation or a physical appropriation of property." *Fin. Oversight*, 54 F.4th at 58 n.18. Usually, this would occur when the government acquires property through eminent domain or if the government physically occupies or takes possession of any portion of private property without acquiring title to it. *Cedar Point Nursery et al., v. Hassid, et al.*, 141 S.Ct. 2063, 2071 (2021). "Physical takings claims involve the

straightforward application of per se rules, which means that when the government takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." *Fin. Oversight*, 54 F.4th at 58 n.18.

However, "[w]hen the government, rather than appropriating private property for itself or a third party, instead imposes regulations that restrict an owner's ability to use his own property, a different standard applies." *Cedar Point Nursery et al., v. Hassid, et al.*, 141 S.Ct. 2063, 2071 (2021). "A regulatory taking transpires when some significant restriction is placed upon an owner's use of his property for which justice and fairness require that compensation be given." *Fin. Oversight*, 54 F.4th at 58 n.18. "To determine whether a use restriction effects a taking, this Court has generally applied the flexible test developed in *Penn Central*, balancing factors such as: the economic impact of the regulation; its interference with reasonable investment-backed expectation and; the character of the government action." *Cedar Point*, 141 S.Ct. 2072 (discussing *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (U.S.N.Y. 1978)). When it is determined that the action rises to the fundamental equivalent of a physical taking, it is commonly called a "regulatory taking". *See, id*. "Regulatory taking claims that allege less than a 100% loss in use or value of the property are reviewed under the case-by-case, factual inquiry set out in *Penn Central*." *Id*. "Courts bypass these factors, however, when a restriction on the use of property results in the physical occupation of property or deprives the property owner of all economically viable use of its land." *See Soscia Holdings, LLC v. Gray*, No. 22-CV-266-LM-AKJ, 2024 WL 1257023, at *10 (D.R.I. Mar. 25, 2024).

## 1. **Plaintiffs Have Not Established a Physical Takings Claim**

Count I of Plaintiff's Amended Complaint alleges that "Defendants refusal to permit Plaintiff Legend's Creek Farm to operate a public water supply well on its property because the adjoining junkyard might be polluting the ground water or water table constitutes the imposition of a negative or restrictive easement on the Mill Road Property in favor of the junkyard." See SOF ¶ 6. Yet, there is no evidence in this record to show that any negative or restrictive easement has been placed on this property, because it does not exist. Plaintiff alleges that this "per se physical taking had a severe economic impact on Plaintiffs because it greatly diminished the market value of Legends Creek Farm and of the Mill Road Property." See SOF ¶ 7.

### i.   Plaintiff Has Not Established a Property Interest

"Just because a regulatory action impacts economically beneficial circumstances for a plaintiff does not necessarily mean that the law recognizes those circumstances as a protected property interest for the plaintiff." *§ 16:4. Protected property interests*, 2 Am. Law. Zoning § 16:4 (5th ed.) "To make a cognizable claim of a taking in violation of the Fifth Amendment, the plaintiffs must first show that they possess a recognized property interest which may be protected by the Fifth Amendment. The plaintiffs must point to credible sources for their claimed property interest … 'such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1, 27 (1st Cir. 2007). "Intangible property rights, 'the group of rights inhering in the

citizens relation to the physical thing, as the right to possess, use and dispose of it[,]' which are recognized by state law are protected by the Takings Clause." *Washington Legal Foundation v. Massachusetts Bar Foundation,* 993 F.2d 962, 973 (1st Cir. 1993). Nevertheless, "[n]ot all asserted property interests are constitutionally protected, however, as 'a mere unilateral expectation or an abstract need is not a property interest entitled to protection.'" *Id.* (citing *Webb's Fabulous Pharmacies, Inc., v. Beckwith*, 449 U.S. 155, 161, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980)).

Plaintiff does not have a property interest in the public water supply permit. "[A]n applicant does not have a property interest in the renewal of a license if the reviewing body has discretion to deny renewal or to impose licensing criteria of its own creation." *Thorton v. City of St. Helens*, 425 F.3d. 1158, 1165 (9th Cir. 2005). "The Takings Clause protects property interests but does not create them. Instead, 'the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law.'" *Hignell-Stark v. City of New Orleans*, 46 F.4th 317, 322 (5th Cir. 2022) (citing *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 118 S.Ct. 1925, 141 L.Ed. 174 (1998)). Plaintiffs have not pointed to any independent source that would give them a property interest in a public water supply permit.

Even further, when analyzing Plaintiffs' alleged due process violations, this Honorable Court has found that "Plaintiffs did not have a property interest in the public water supply permit". See SOF ¶ 4. "The state law involved here gives the State discretion to apply the chapter's requirements and approve or deny an

application commensurate with its compliance or noncompliance." *See Id*. The Court further found "[w]hen that discretion is not only based on the statutory language but also the public health and safety purpose of the law, Plaintiffs did not have legitimate claim of entitlement to the public water supply permit." *See Id*.  It is true that "a property interest for purposes of procedural due process does not automatically qualify as a property interest protected by the Takings Clause." See *Hignell-Stark* 46 F.4th at 322.  The test for determining a property interest under the Takings Clause is similar, but not the same as a property interest for due process. *Id*. "[A] property interest [under the Takings Clause] must be so deeply rooted in custom that 'just compensation' for appropriating necessarily includes money damages. Surmounting that hurdle should be quite difficult." *Id*. (citation omitted).

*Waste Servs. of the Bluegrass, LLC v. City of Georgetown, Kentucky,* analyzed the key differences in a property interest as defined under a due process analysis versus a takings analysis. *Waste Servs. of the Bluegrass, LLC v. City of Georgetown, Kentucky,* No. CV 5:20-410-KKC, 2023 WL 2759030, at *10 (E.D. Ky. Mar. 31, 2023), *amended in part,* No. CV 5:20-410-KKC, 2024 WL 843959 (E.D. Ky. Feb. 28, 2024). The Court found that under due process, a party does not have a protected property interest "'when the state's decision to award or withhold the benefit is wholly discretionary.'" *Id*. (quoting *Andrews, Tr. of Gloria M. Andres Tr. Dated April 23, 1998 v. City of Mentor, Ohio*, 11 F. 4th 462, 468 (6th Cir. 2021)). The fact that the Cabinet or Planning Commission had the discretion to deny Plaintiff's permit application for expanded capacity did not mean that Plaintiffs, Waste Services, did

not have a property interest in expanding the capacity of the landfill. *See Id*. Instead, the Court found that "Waste Services must establish that the right to expand the landfill was part of a 'bundle of rights' it acquired when it took title to the property at issue." *Id*. (discussing *Lucas v. S.C. Coastal Council,* 505 U.S. 1003 (1992)). "This bundle includes basic property rights like the 'rights to possess, to use, to exclude to profit, and to dispose.'" *Id*. (quoting *Andrews,* 11 F.4th at 469; *Brotherton v. Cleveland,* 923 F.2d 477, 481 (6th Cir. 1991)). What is not included in this bundle is the right to use the land in certain ways. *See Id*. Whether or not a property right is included in the title to the land "turns upon an analysis of what [restrictions] the 'background principles of the State's law of property and nuisance already place on land ownership.'" *Id*. (quoting *Lucas*, 505 U.S. 1029)

"The question is whether the government action at issue simply prohibited the landowner from doing something that the government could have prohibits anyway under state property and nuisance laws." *Id*. If Waste Services were challenging the ordinance which zoned its property as agricultural, then "perhaps the ordinance would not be considered a background principle of property law that would determine whether Waste Services has a property interest for takings purposes in expanding the landfill." *Id*. Since the county could have prohibited the expansion of the landfill operations by way of the zoning ordinance, Waste Services cannot be deemed to have a property interest in expanding the landfill that was protected under the Takings Clause. *Id*.

When Plaintiffs here purchased the property at 27 Mill Road, the property was "zoned Agricultural Residential with a legal, pre-existing, non-conforming commercial use." See SOF ¶ 44. The property had two dug wells and one drilled well at the time of purchase, neither which could have been used for a public water supply. See SOF ¶ 45. The property was not approved for a public water supply permit when Plaintiffs purchased the property and Plaintiffs were aware that they needed to apply for the public water supply permit in order to operate a commercial kitchen in the future. See SOF ¶ 46. The statute which governs public water supplies, R.I.G.L. § 46-13-4, is clear that no public water supply shall be constructed until the plan and specifications have been approved by the director. See R.I.G.L. § 46-13-4. The Rhode Island Supreme Court has held that under this statute, "no one may operate a public water supply system in this state without first obtaining an annual approval of that system from the director of the Rhode Island Department of Health." *Kent County Water Authority v. State Dept. of Health*, 723 A.2d 1132, 1143 (R.I. 1999). The Rhode Island Supreme Court has also held that maintaining a public water supply falls squarely within a municipalities' police power. *See Mill Realty Associates v. Crowe*, 841 A.2d 668, 674 (R.I. 2004). The State has full authority to regulate public water supplies and who maintains them.

"A property interest is grounded in a legally enforceable right, not an expectancy." *Woodland Manor III Assocs., L.P. v. McLeod*, No. 89-2477, 2000 WL 276820, at *7 (R.I. Super. Mar. 2, 2000). A public water supply permit is an expectancy, not a legally enforceable right. As this Court found with respect to

Plaintiffs' alleged due process violations, Plaintiffs also failed to establish a protected property right necessary for a constitutional takings claim and therefore their takings claims must fail.

ii. Even If Plaintiffs Have Alleged a Property Interest, Plaintiffs Have Not Adequately Alleged That a Physical Taking Has Occurred.

Even assuming that Plaintiffs have demonstrated a protected property interest, Plaintiffs have not plausibly established that a physical taking occurred with respect to such a property interest. Plaintiff alleges that Defendants' refusal to grant a public water supply permit constitutes the "imposition of a negative or restrictive easement on the Mill Road Property in favor of the junkyard," and should therefore be compensated for such. See SOF ¶ 6. The Takings Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *Lingle v. Chevron U.S.A. Inc*, 544 U.S. 528, 538, 125 S. Ct. 2074, 2081, 161 L. Ed. 2d 876 (2005). (*quoting First English Evangelical Lutheran Church of Glendale v. County of Los Angelos*, 482 U.S. 304, 314 107 S.Ct. 2378, 96 L.Ed. 2d 250 (1987)). "[I]t is designed not to limit the governmental interference with property rights per se, but rather secure compensation in the event of otherwise proper interference amounting to a taking." *Id.*, at 315. The Supreme Court has held that "[o]ur precedents stake out two categories of regulatory action that generally will be deemed per se takings for Fifth Amendment purposes." *Id.* "'A physical taking occurs either when there is a condemnation or a physical appropriation of property.'" *Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v.*

*Flores Galarza*, 484 F.3d 1, 27 (1st Cir. 2007) (*citing Philip Morris, Inc. v. Reilly*, 312 F. 3d 24, 33 (1st Cir. 2002) (en banc)). Supreme Court cases have confirmed the three distinctions between varying takings claims; a permanent physical occupation; a physical invasion short of an occupation; and a regulation that merely restricts the use of the property. See *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed. 868 (1982). The first two categories of a physical taking do not apply here but Defendant will briefly address them below as they are the basis of Count I.

The first category requires an owner to suffer a permanent physical invasion of the property. *See Lingle*, 544 U.S. 528 (see also *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed. 868 (1982)). This is a very narrow category. In *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) the Court found that the Government's imposition of a navigational servitude requiring public access to a pond took the landowners right to exclude and will result in an actual physical invasion of the privately owned marina. *See Id.* This easement of passage, "not being permanent occupation of land, was not considered a taking *per se, Kaiser Aetna* reemphasizes that a physical invasion is a governmental intrusion of an *unusually serious character." See Loretto* at 433. "[T]he government does not simply take a single 'strand' from the 'bundle' of property rights; it chops through the bundle taking a slice of every strand." *See Id.* (*quoting Andrus v. Allard*, 444 U.S. 51, 65-66). This is simply not the case here. Plaintiffs are alleging the denial

of a discretionary permit, not any "physical invasion" by the government onto their land.

The second category applies to regulations that completely deprive the owner of all economically beneficial use of the property. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d. 798 (1992)). A restriction on use denies all economically beneficial or productive use of property when it leaves the property "economically idle". *Id*. Even a severe or substantial impairment of a property's economic use is not enough to bypass the *Penn Central* factors. *See Holcim-NER, Inc. v. Town of Swampscott*, 671 F.Supp.3d 84, 93 (D.Mass. 2023). Plaintiffs made economically beneficial use of its property by residing on the property; operating the Legends Creek business on the property; and operating a successful rental property through Airbnb. See SOF ¶ 41-43. This is not a *Lucas* taking, which would require "extraordinary circumstance[s] when no productive or economically beneficial use of land is permitted." *Lucas*, 505 U.S. at 1017-18. The Rhode Island Supreme Court, in analyzing a takings claim under the Fifth Amendment has held "that pecuniary loss or diminution in value is not controlling on the issue of confiscation because a property owner does not have a vested property right in maximizing the value of his property." *Annicelli v. Town of South Kingstown*, 463 A.2d 133, 140 (R.I. 1983). "The mere fact that plaintiff may have not received the anticipated return on his investment does not render nugatory the remaining value of the land." *Algeria v. Keaney*, 687 A.2d 1249, 1252 (R.I. 1997) (*see also Annicelli* 463 A.2d at 140). There is absolutely no evidence to support the claim that Plaintiffs were

deprived all economically beneficial use of the property, as their business continued to operate and make a profit even after the permit was denied. See SOF ¶ 41-42. Just because Plaintiffs did not receive the anticipated additional return on their investment on top of the profits they were already making which does not equate to a per se physical taking of their property.

Plaintiffs cannot establish a physical takings under the Fifth Amendment, and therefore Count I of the Amended Complaint should be dismissed.

2.  **Plaintiffs Cannot Establish a Regulatory Takings Claim Under** *Penn Central.*

"When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* 535 U.S. 302, 321, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). However, "[w]hen the government, rather than appropriating private property for itself or a third party, instead imposes regulations that restrict an owner's ability to use his own property, a different standard applies." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-48 (2021).

"To determine whether a use restriction effects a taking, this Court has generally applied the flexible test developed in Penn Central, balancing factors such as: 1) the economic impact of the regulation; 2) its interference with reasonable investment-backed expectation; and 3) the character of the government action." *Cedar Point*, 594 U.S. 139 (discussing *Penn Central Transp. Co. v. City of New York,*

438 U.S. 104 (U.S.N.Y., 1978)). When it is determined that the action rises to the functional equivalent of a physical taking, it is commonly called a "regulatory taking." *See id.* "Regulatory taking claims that allege less than 100% loss in use or value of the property are reviewed under the case-by-case, factual inquiry set out in *Penn Central*." *Id.*

In Count II, Plaintiffs contend that "Defendants' refusal to permit Plaintiff Legends Creek Farm to operate a public water supply well on its property because the adjoining junkyard might be polluting the ground water or water table constitutes a regulatory taking." See SOF ¶ 8. Plaintiffs allege that "[t]he regulatory taking has had a severe economic impact on Legends Creek Farm because it significantly diminished the combined market value of the business and the Mill Road Property by many millions of dollars" and that the "regulation has interfered with Plaintiffs' distinct investment-backed expectations because Restivo purchased the Mill Road Property with the intention that Plaintiffs would grow and sell agricultural products on the site." See SOF ¶ 9-10. The record provides no viable support that RIDOH's actions here effect a taking under the *Penn Central* balancing factors.

i.    <u>Plaintiff failed to show that the economic effect of the regulation rises to the level of a taking.</u>

The focus of the economic effect factor is typically on the change in fair market value of the subject property caused by the regulatory burden. In other words, the court must compare the value that has been taken from the property with the value that remains in the property. *See generally, Keystone Bituminous Cool Ass'n. v. DeBenedictis*, 480 U.S. 470, 497 (1987); *Cane Tenn., Inc. v. United States*, 57 Fed. Cl.

115, 123 (Fed. Cl. 2003). "Courts will only protect a claimant's reasonable expectations." *Me. Educ. Ass'n Benefits Tr. v. Cioppa*, 695 F.3d 145, 153 (1st Cir. 2012). Here, just as in *Alegria v. Keeney,* "the regulation in this case prevented plaintiff from pursuing what he deemed to be the most profitable uses of his land." *Alegria*, 687 A.2d at 1253. "[P]laintiff has suffered the denial of a particular development proposal and that any diminution in the value of his property resulting from this denial did not itself rise to the level of interference with a vested property right." *Id.*

First, Plaintiffs bought the property at 27 Mill Road in July 2014 for $396,750.00. See SOF ¶ 13. Then in January 2021, Plaintiffs sold the property for $804,000.00. See SOF ¶ 34. Plaintiffs made a profit of $407,250.00. Plaintiffs allege that the property could have sold for another $225,000.00 if the permit had been approved. See SOF ¶ 63. This is merely speculation, but putting that aside, even if the property would have been allegedly valued at over $1 million, Plaintiffs still sold the property at a profit without the approval of the public water supply permit. Plaintiffs suffered no actual loss. Furthermore, Plaintiffs' Jon Restivo and Aden Mott sold the business, Legends Creek, LLC in May 2020 for $750,000.00. See SOF ¶ 40. Plaintiffs allege that they lost over $4 million in profits when selling the business. See SOF ¶ 64. Mr. Restivo testified that what funded Legends Creek in the beginning was the use of "retail arbitrage" and the business grew organically without additional funding. See SOF ¶ 16. Then after years of making a profit, Mr. Restivo and Mr. Mott sold the business for $750,000.00. See SOF ¶ 40. A business, that was sold with "the

vast majority of the purchase price was allocated to good will." See SOF ¶ 56. Plaintiffs made $750,000.00 off of the Legends Creek name alone, a profitable sell indeed.

A regulation which prohibits the highest best use of land is not, by itself, enough to impose liability. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). Plaintiffs were still able to successfully operate the business at a profit without the public water supply permit; and then were able to make a profit on both the sale of the property and the business. See SOF ¶ 34, 40-43. Plaintiffs allege that they lost money due to the permit denial—yet they were able to still continue the operation of the business on the property as it had been operated since 2014; Plaintiffs sold the property at issue for profit; and sold the Legends Creek business for a profit. Also, Mr. Restivo and Mr. Mott voluntarily sold the business; a business they absolutely could have continued to operate if they had so chosen. The permit denial, as in *Penn Central,* still allows Plaintiffs to "continue to use the property precisely as it has been used" since Plaintiffs purchased the property. 438 U.S. at 115. Plaintiffs were still permitted not only to profit from the land and business, but also obtain as "reasonable return" on its investment. *See Id.*

ii.   <u>Plaintiffs Have Failed to Establish the Permit Denial Has Interfered with Distinct Investment-Backed Expectations Enough to Rise to the Level of a Taking.</u>

The investment-backed expectations prong requires an objective, fact-specific inquiry into what, under all the circumstances, the landowner should have anticipated when investing in the property. Courts only protect a claimant's

objectively reasonable expectations, and a party's subjective expectation is irrelevant to whether that expectation is reasonable. *Penn Central,* 438 U.S. at 122. Here, Plaintiff alleges that "the regulation has interfered with Plaintiffs' distinct investment-backed expectations because Restivo purchased the Mill Road Property with the intention that Plaintiffs would grow and sell agricultural products on the site." See SOF ¶ 10. However, *Penn Central* itself rejected a similar notion when it found that "the submission that appellants may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development[,] is quite simply untenable." *Penn Central*, 438 U.S. at 130. "The right to improve property, of course, is subject to the reasonable exercise of state authority, including the enforcement of a valid zoning and land-use restrictions." *Palazzolo v. Rhode Island*, 533 U.S. 606 (U.S.R.I., 2001) (citing *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 158, 413 (1922) ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.")

It is nonsensical for Plaintiffs to argue that this discretionary statute and its regulations interfered with any reasonably backed investment. R.I.G.L. § 46-13-2.1, requires RIDOH approval for a public water supply permit and was enacted on July 7, 2007. The statute clearly states that

> "[u]pon the receipt of an application, the director shall review the application, supporting documents, and conduct an inspection of the public water supply system to determine if it meets the requirements for approval set forth in this chapter and the regulations adopted hereunder. If, after review, the director determines that the public water

> supply system complies with the requirements of this chapter and the regulations adopted hereunder, approval of the application to operate or maintain a public water supply system shall be granted."

R.I.G.L. § 46-13-2.1. Nowhere in this statute is there a guarantee that a public water supply would be granted to Plaintiffs, but in fact is clear that the permit is subject to the director of RIDOH's approval. Plaintiffs cannot rely on a discretionary permit as a reasonable expectation. Plaintiffs were also aware that they would need to apply for this permit for approval in order to expand their business. See SOF ¶ 57. This statute is clearly discretionary and in no way does it guarantee a public water supply to every applicant. Plaintiffs' argument is basically that every application for a public water supply permit should be rubber stamped as approved, no matter RIDOH's public health concerns.

Furthermore, Plaintiff knew of the existence of the abutting salvage yard when they bought the property. Mr. Restivo testified that at the time they purchased the property they saw the large field next to 27 Mill Road, but did not believe it was operational. See SOF ¶ 39. Plaintiffs made many improvements to the property that were not attached to the public water supply permit and made money off these investments. See SOF ¶ 43, 48-50. Even after RIDOH denied the public water supply permit, Plaintiffs continued to operate the business as it had been operating and were continuing to make money from the business. See SOF ¶ 41-42.

The United States Supreme Court held in *Penn Central* that the New York City law at issue in that case did not interfere in any way with the present uses of the Terminal. *Penn Central* 438 U.S. at 115.

"Its designation as a landmark not only permits but contemplates that appellants may continue to use the property precisely as it has been used for the past 65 years; as a railroad terminal containing office space and concessions. So the law does not interfere with what must be regarded as Penn Central's primary expectation concerning the use of the parcel. *More importantly, on this record, we must regard the New York City law as permitting Penn Central not only to profit from the Terminal but also to obtain a 'reasonable return' on its investment.*"

*Id.* (emphases added). The Supreme Court went on to hold that "[t]he restrictions imposed are substantially related to the promotion of the general welfare and not only permit reasonable beneficial use of the landmark site but also afford appellants opportunities further to enhance not only the Terminal site proper but also other properties." *Id.* at 116. Just in line with *Penn Central*, RIDOH's permit denial in no way interfered with the present use of the property or the operation of Plaintiffs' business and does not arise to a regulatory taking.

### iii.    The Character of the Government Action Itself Does Not Rise to The Level of a Taking.

"With respect to the third Penn Central factor – the character of the government action – a taking is less likely to occur when the challenged action 'arises from some public program adjusting the benefits and burdens of economic life to promote the common good.'" *Soscia Holdings* at *16 (*citing Penn Central*, 438 U.S. at 124). RIDOH is an administrative agency charged with the "cognizance of the interests of life and health among the people of the state … all other conditions and circumstances on the public health and do all in its power to ascertain the causes and best prevent and control diseases and conditions detrimental to the public health in the state." R.I.G.L § 23-1-1. R.I.G.L. § 46-13-1 "is to aid in assuring the public is provided with safe and potable drinking water" and charges the Director of RIDOH

with the responsibility of approving or denying all applications for a public water supply system.

"[I]n instances in which a state tribunal reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land, this Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests." *Penn. Central* 438 U.S. at 111. For example, zoning laws "which have been viewed as permissible governmental action even when prohibiting the most beneficial use of the property." *Id.* (*see also Goldblatt v. Hempstead*, 369 U.S. 592-593, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962)). This RIDOH statute is a regular exercise of Rhode Island's police power necessary to protect health and safety by safeguarding drinking water accessible by the public. *See Mill Realty Associates*, 841 A.2d at 674. As the allegations and evidence show in this case, RIDOH has sought to ensure that the public is not exposed to contaminated, unhealthy drinking water in denying Plaintiff's application for a public water supply permit. See SOF ¶ 31-32. The public drinking water statute and its related regulations simply ensure this goal and protect the public from any unnecessary risk of consuming contaminated drinking water and safeguarding the health of the people of the state. There is nothing in the drinking water statute that conveys any right to operate or maintain a public water supply.

Plaintiffs have failed to establish a regulatory takings claim that would entitle them to relief for violation of the Takings Clause, Count II must be dismissed.

## IV.    CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court grant their Motion for Summary Judgment.


Respectfully submitted,

THE STATE OF RHODE ISLAND
and THE RHODE ISLAND
DEPARTMENT OF HEALTH

By:

PETER F. NERONHA
ATTORNEY GENERAL

*/s/ Shannon L. Haibon*
Shannon L. Haibon, #9860
Special Assistant Attorney General
Office of the Attorney General
150 South Main Street
Providence, RI 02903
Tel (401) 274-4400 ext. 2018
Fax (401) 222-2995
shaibon@riag.ri.gov

## CERTIFICATION

I, the undersigned, hereby certify that I have filed the within Document via the ECF System and that it is available for viewing and downloading on the 30th day of September, 2024.

*/s/ Shannon L. Haibon*