UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| LEGEND'S CREEK LLC, JON RESTIVO and ADEN MOTT<br>        Plaintiffs<br>Vs.<br><br>THE STATE OF RHODE ISLAND and the RHODE ISLAND DEPARTMENT OF HEALTH<br>        Defendants | C.A. No. 22-cv-309 |

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to F.R.Civ.P. 56(a), Plaintiffs hereby move for summary judgment respecting liability on Count I of their Amended Complaint alleging a physical taking of their property by Defendants in violation of the Fifth and Fourteenth Amendments. The Federal Circuit has said that "[w]hether a taking has occurred is a question of law based on factual underpinnings." Memmer v. United States, 50 F.4th 136, 143-44 (Fed.Cir. 2022).

FACTUAL ALLEGATIONS

Plaintiff Legend's Creek LLC is a limited liability company formed under Rhode Island law, and which operated as Legend's Creek Farm. At the time of the relevant events, it was located and operating in Rhode Island. Legend's Creek LLC's principal place of business is now located in Vermont. (SUF 1). Plaintiffs Jon Restivo and Aden Mott are the members of Legend's Creek LLC. At the time of the relevant events, they were citizens and residents of the State of Rhode Island. They are now citizens and residents of the State of Vermont. (SUF 2). Restivo and Mott have been married since 2008. (SUF 3). Restivo is an attorney with DarrowEverett LLP in Providence, Rhode Island, as well as the Managing Partner of that firm. (SUF 5). Mott attended Norfolk County Agricultural High School and managed Legend's Creek Farm with Restivo's assistance. (SUF 6).

1

Restivo and Mott formed Legend's Creek Farm on March 16, 2012 for the purpose of selling personal care products through the internet. (SUF 4). Restivo originally purchased a property at 38A Hartford Pike, Foster, Rhode Island ("the Hartford Pike Property") at which Mott and he resided and operated Legend's Creek Farm. However, Plaintiffs wanted to grow raw materials and process food products using those raw materials as well as materials provided by third parties on their own property and operate a commercial kitchen on the property. A RIDOH official told Mott that the Hartford Pike Property could not accommodate these uses because of wetlands on the Property. (SUF 7).

Accordingly, in July 2014, Restivo purchased the property at 27 Mill Road in Foster ("the Mill Road property") for $396,750. It was approximately 52 acres, zoned Agricultural Residential with a legal, pre-existing non-conforming commercial use. Restivo and Mott resided at the property and operated Legend's Creek Farm at that location until 2020. (SUF 8). Plaintiffs initially grew some raw materials on the farm, including honey as well as some herbs used in herbal salves, and originally made bar soap using soap from goats raised on the farm, but they also purchased other materials. They processed the personal care products on the property to varying degree depending on the product. (SUF 9).

In 2014, the Mill Road Property had two dug wells, and one drilled well at the time. The drilled well was not operable according to Plaintiffs' engineer, Robert Ferrari. One of the two dug wells was contaminated with bacteria because of a pond on the property. The other dug well serviced a separate building on the property but was otherwise usable. (SUF 10).

Under RIDOH regulations, to process and sell food, Legend's Creek Farm needed a commercial kitchen. Legend's Creek Farm built a new barn to accommodate the growing business and house the food production facilities, but RIDOH will not let them put the commercial kitchen

in the barn without a public water supply permit. This permit required a public water supply from a well on the property. RIDOH indicated that the existing dug well that was Plaintiffs' water source would not meet RIDOH requirements. (SUF 11). The RIDOH regulations then in effect required a PWS applicant for a well of this proposed usage to control 200 feet of property around the wellhead and to identify any potential source of contamination located within 1750 feet of the wellhead. (SUF 12). Prior the Legend's Creek application, RIDOH had routinely and frequently granted PWS applications where there was a potential source of contamination within 1750 so long as testing showed no contamination of the groundwater near the wellhead and the permit holder agreed to future, regular testing of the water for contamination, and/or there were other mitigating factors regarding potential well water contamination. (SUF 13).

Legend's Creek LLC retained Ferrari, and his firm, New England Water Solutions, Inc. (NWSI), in 2018 to assist it with an application for a PWS permit at the property. On June 24, 2018, Ferrari applied for a PWS permit on behalf of Legend's Creek. That application set forth that Legend's Creek had control of the property within 200 feet of the proposed wellhead. The application also identified a potential source of contamination within 1750 feet of the wellhead, i.e., Wright's Auto Salvage yard, which was the adjoining property to the north of Legend's Creek. (SUF 14).

Plaintiffs also filed applications with other state and local governmental entities for necessary permits and approvals, including the Rhode Island Department of Environmental Management ("RIDEM") for a septic system, and the Town of Foster for a building permit. (SUF 15).

It is undisputed that there was no potential source of pollution within 200 feet of the proposed PWS. (SUF 16). Based on Ferrari's professional experience and knowledge of the soil

3

and geologic conditions, and the hydrology on the Legend's Creek property and the amount of water that Legend's Creek planned to pump from the proposed well, he estimated that the distance around the well from which it would be drawing water (the "recharge area") to be approximately 50 feet, and certainly no more than 200 feet, well within the 538 foot distance from the wellhead to the Wright's property line. (SUF 17). RIDOH has no data to dispute Ferrari's opinion as to the recharge area. (SUF 18).

The Rhode Island Department of Environmental Management (RIDEM) classifies the groundwater in that area as "GA." (SUF 19). This means it "may be suitable for public or private drinking water without treatment." R.I.Gen.L. § 46-13.1-4. Testing of the groundwater under Legend's Creek as of October 29, 2019 showed no contamination and the water was found to be potable. (SUF 20).

Ferrari advised RIDOH that any surface contamination from Wright's carried away by surficial runoff towards the Legend's Creek property would flow into Hemlock Brook, which separated the Wright's property from the Legend's Creek property, and then be carried downstream toward the Barden Reservoir and the Scituate Reservoir. RIDOH officials agreed. (SUF 21).

With respect to environmental issues like groundwater contamination, RIDEM regulates and inspects auto salvage yards like Wright's. NWSI contacted RIDEM and were informed that they had no information indicating that Wright's was contaminating the groundwater under its property. (SUF 22). RIDEM has the regulatory authority to require Wright's to investigate whether it has contaminated the groundwater. (SUF 23). It has done between five and ten inspections of Wright's between 2016 or 2017 and 2024. (Id.). RIDEM has never had sufficient grounds to require Wright's to investigate whether it has contaminated the groundwater. (Id.). RIDOH has

not asked RIDEM to investigate whether Wright's had contaminated the groundwater because RIDEM did not have the money to do so in its budget and "it is not a simple task." (SUF 29).

In Ferrari's profession opinion, it was relatively unlikely that groundwater was flowing from the Wright's property toward the Legend's Creek property because the topography of most of the Wright's property slopes to the east and southeast away from the Legend's Creek property and groundwater typically flows in the same direction as the surface topography. (SUF 24). RIDOH acknowledged that there were no test results or other data confirming that Wright's Auto Salvage had contaminated the groundwater under its property or that that groundwater was moving toward the Legend's Creek property. (SUF 25). RIDOH has not quantified the likelihood that Wright's is contaminating the groundwater under it or that the groundwater is moving towards the Legend's Creek property. (SUF 26).

A review of other RIDOH well-permit application files shows that RIDOH has approved other wells with actual evidence of some contamination, has never previously enforced this 1750 foot "requirement," and has approved variances on the 200-foot requirement. It has approved hundreds of permits for wells within 1750 feet of a source of pollution. (SUF 27). RIDOH admits that the Legend's Creek Farm permit complies with the literal language of the regulation, in part, because there is no source of contamination within 200 feet of the well. However, RIDOH now interprets the regulation to allow it to deny permit applications for wells within 1750 feet of a potential source of pollution. It claims the junkyard is a significant potential source of pollution. (SUF 28).

Based on their discussions with RIDOH personnel and to establish that the proposed well could produce potable water, Legend's Creek Farm proceeded to hire a company to drill the well. Ferrari, who provides training for RIDOH officials, selected the site for the well as set forth in the

application. It is 800 feet deep and produces potable water. (SUF 30). Legend's Creek Farm also proceeded with the other work necessary to operate the food processing business including building the septic system, constructing the barn and outfitting the space where the commercial kitchen is intended to go with code-compliant building materials. (SUF 31).

On October 5, 2018, RIDOH denied the Legend's Creek application for the PWS permit stating that "The existence of this significant source of pollution [Wright's] within the wellhead protection area, is inconsistent with the Regulations." RIDOH was unable to identify with what part of the Regulations this was inconsistent. (SUF 32). Carlene Newman of RIDOH explained that there was a possibility that Wright's Auto Salvage <u>might</u> be contaminating the groundwater under it with unknown contaminants for which there was no current testing protocol, and the groundwater <u>might</u> be flowing towards the Legend's Creek property. (SUF). RIDEM disagrees with RIDOH interpretation and application of the 1750 feet distance requirement. (SUF 34).

To Ferrari's knowledge, the Legend's Creek application was the very first one in which RIDOH said that the applicant would have to prove that an identified potential source of contamination within 1750 feet, i.e. Wright's Auto Salvage, not only was not contaminating the applicant's groundwater but could not contaminate the applicant's groundwater by demonstrating affirmatively that the groundwater under Wright's was not flowing towards the applicant's property. (SUF 35). On November 5, 2018, Legend's Creek Farm submitted a written appeal of RIDOH's initial decision. (SUF 36).

On April 9, 2019, Legend's Creek Farm and Ferrari had a meeting with RIDOH and a R.I. Department of Administration small business ombudsman. During that meeting, RIDOH said there was no possible way to install a public water supply on the property. RIDOH said it would never have encouraged Legend's Creek Farm to proceed with its original application if it had been

aware of the proximity of the junkyard. Legend's Creek Farm asked RIDOH not to make a decision on the second well-permit application. (SUF 37). Legend's Creek Farm offered to conduct regular testing of the well once RIDOH issued the permit, but RIDOH rejected that offer because they felt testing would not adequately address their concerns due to the potential for contamination from pollutants that were not regulated, known, or capable of being tested for. (SUF 38). RIDOH's condition of hydrogeologic testing effectively imposed a condition that Legend's Creek Farm fund a determination of whether the adjoining junkyard is polluting the nearby groundwater and, possibly, the Scituate Reservoir. (SUF 39).

On July 23, 2019, Ferrari submitted a proposal by Legend's Creek to RIDOH for a multi-phase groundwater monitoring and testing program in the area of the Legend's Creek property where they thought it most likely that any contamination from Wright's Auto Salvage might reach the groundwater under Legend's Creek. (SUF 40). NWSI proposed that RIDOH provide Legend's Creek with a conditional PWS approval subject to conducting the program for 90 days. The estimated cost of the program was $ 84,800.00. (Id.). On August 6, 2019, Newman responded to the proposal with a very different monitoring and testing program that required groundwater wells in the wetlands area on both sides of Hemlock Brook. (SUF 41).

The RIDOH proposed monitoring and testing program presented significantly greater legal issues because RIDEM would have to approve any drilling in wetlands and obtaining that approval could take between 60 days and a year, depending on the extent of the alteration of the wetlands required. (SUF 42). The RIDOH proposed monitoring and testing program also presented significantly greater logistical issues because it would require transporting very large well drilling rigs down a steep hill into a nearly inaccessible area and preparing drilling sites for them in the wetlands. (SUF 43).

7

Ferrrari spoke on the phone with Newman after receiving her August 6th email. He told Newman that her proposal presented these very significant legal and logistical issues and that Legend's Creek's proposed monitoring and testing program should be sufficient to satisfy any health concerns. (SUF 44). At no time during any of their communications, or ever, did Newman tell Ferrari that RIDOH's response was negotiable or that RIDOH was otherwise flexible respecting the testing and monitoring program set forth in her email. (SUF 45).

Plaintiff's environmental expert, Rick Mandile, has opined that complying with the RIDOH testing program would cost $ 474,300-$ 589,300. (SUF 46).

Legend's Creek Farm was a profitable company, however, on July 1, 2020, Restivo and Mott sold the Legend's Creek Farm brand to an Idaho company because it had become so successful and was growing so rapidly that they could not accommodate its growth on the Mill Road Property due to the unresolved status of the public water supply permit and inability to use the barn. (SUF 47).

On November 30, 2020, after an administrative hearing, RIDOH issued a written decision recommending that Legend's Creek Farm's application for a permit be denied. (SUF 48). On December 3, 2020, the Director of RIDOH adopted the decision and recommendation. On December 29, 2020, Legend's Creek LLC filed an administrative appeal of the RIDOH decision in Rhode Island Superior Court. (SUF 49).

On January 19, 2021, Restivo accepted an offer of $804,000 for the Mill Road Property. He would not have sold the property if Defendants had allowed the public water supply permit. (SUF 50). On April 22, 2022, the Superior Court rendered a bench decision holding that Plaintiffs no longer had standing to seek the public water supply permit. On May 23, 2022, the Superior Court entered an order denying the appeal. (SUF 51).

Restivo and Mott had hoped to start a family by now which can be very expensive for a gay couple. However, they have had to expend their money on their fight with RIDOH over this public water supply system permit. (SUF 52).

Plaintiffs have substantial economic damages in that the denial of the public water supply system permit prevented Legend's Creek Farm from operating a commercial kitchen on the Mill Road Property which would have generated significant profits for the business consistent with Plaintiff's substantial investment in the business. In addition, the denial of the permit significantly restricted the economic appreciation of the value of the Mill Road Property. Further, Restivo's and Mott's substantial expenditures of their personal funds in a fruitless attempt to obtain the permit prevented them from starting a family and caused them great personal distress. Plaintiffs' economic and personal damages are millions of dollars. (SUF 53).

Plaintiff's real estate valuation expert, Zach Smith, has opined that the Legend's Creek property would have been worth an additional $ 225,000 if it had the PWS permit. (SUF 54). Plaintiff's business valuation expert, Steven Shapiro, has opined that Legend's Creek would have earned additional profits of $4,822,160 had Restivo and Mott continued to operate it. (SUF 55). Legend's Creek Farm expended $594,465 on improvements to the property to operate its business, including amounts spent to obtain the well permit. (SUF 56).

## PROCEDURAL HISTORY

Plaintiffs filed suit in August 2022. They served an Amend Complaint in October 2022. Defendants moved to dismiss the Amended Complaint in December 2022. On June 23, 2023, the Court issued an Order granting the motion to dismiss in part and denying it in part. In sum, the Court dismissed all of Plaintiffs' claims except Counts I and II, alleging a physical taking and a

regulatory taking, respectively, in violation of the Fifth and Fourteenth Amendments. The Court said with respect to those counts:

> Reviewing the amended complaint, the Court finds that it sufficiently alleges a taking. Legend's Creek alleges that Defendants' refusal to permit them to operate a public water supply well on its property because the adjoining junkyard might be polluting the groundwater or water talble constiutes the imposition of a negative or restrictive easement and/or a regulatory taking on the Mill Road property without just compensation…Plaintiffs allege that Defendants have no evidence that the junkyard is contaminating or could contaminate their property and unfairly places the burden of disproving potential contamination on them which amounts to an unconstitutional taking and diminishes the property's value.

Legend's Creek LLC v. Rhode Island, C.A. No. 22-309, 2023 WL 4054493 at *5 (D.R.I. June 16, 2023).

STANDARD OF REVIEW

In a Report and Recommendation that Judge Smith of this court accepted, Magistrate Judge Sullivan set forth the following standard of review for a summary judgment motion:

> Under Fed.R.Civ.P. 56, summary judgment is appropriate if the pleadings, the discovery, disclosure materials and any affidavits show that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir.2009); Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir.2006) (quoting Fed.R.Civ.P. 56(c)). A fact is material only if it possesses the capacity to sway the outcome of the litigation; a dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir.2010); Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir.2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir.1996)). The evidence must be in a form that permits the court to conclude that it will be admissible at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir.2000) (citing Mulero–Rodriguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir.1996)).

Cranston/BVT Associates, Ltd. Partnership v. Sleepy's, LLC, C.A. No. 13–594, 2015 WL 5793693 at *10 (D.R.I. Sept. 30, 2015).

ARGUMENT

DEFENDANT MADE A PHYSICAL TAKING OF PLAINTIFFS' PROPERTY.

Plaintiff have made a physical taking of Plaintiffs' property by forbidding them to use the groundwater underneath it unless they prove that the groundwater has not flowed from the adjoining property operated by Wright's Auto Salvage, regardless of whether the water is contaminated and without requiring Wright's to determine whether its groundwater is contaminated or is contaminating Plaintiffs' groundwater or even to remediate the potentially contaminated groundwater. This action constitutes imposing an easement on Plaintiffs' property because of two practical effects. First, the Defendants' actions attempt to transfer to Plaintiffs the expense and trouble of conducting testing on their property that rightfully should be done by others who would need an easement to do that work. Second, the denial of Plaintiffs' PWS application essentially gives Wright's the right to contaminate Plaintiffs' groundwater in perpetuity. See, Cedar Point Nursery v. Hassid, 141 594 U.S. 139, 152 (2021) ("The upshot of this line of precedent is that government authorized invasions of property…are physical takings requiring just compensation."). Regulatory action that requires an owner to suffer a permanent physical invasion of its property, however minor, is a physical taking. Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 538 (2005), citing Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982) (Marshall, J.).

Federal courts have frequently held that governmental interference with a property owner's water rights constitutes a physical taking. See, Casitas Municipal Water District v. U.S., 543 F.3d 1276, 1295-96 (Fed.Cir. 2008) (requiring plaintiff to build a fish ladder and divert some water it had the contractual right to obtain from a river constitutes a physical taking); Hendler v. U.S., 952 F.2d 1364, 1378 (Fed.Cir. 1991) (EPA's entry on plaintiffs' land to install groundwater monitoring

wells and to conduct monitoring activity constitutes a physical taking); Klamath Irrigation v. U.S., 129 Fed.Cl. 722, 737 (Fed.Cl. 2016) (landowners claim that government refused to release water to irrigation canals so as to preserve a fish habitat was a physical taking claim);

As background, it has long been true in Rhode Island under the common law that a landowner has the right to use the subterranean waters under his property subject to the caveat that he cannot purposively or negligently divert or contaminate the waters to the harm of his neighbor. Rose v. Socony-Vacuum Corp., 54 R.I. 411, 173 A. 627 (1934), citing Buffum v. Harris, 5 R.I. 243, 253 (1858), abrogated on other grds, Slendorio v. Bilray Demolition Co., Inc., 682 A.2d 461, 465 (R.I. 1996). In Buffum, the Court said:

> The water, whether it has fallen as rain, or has come from the overflow of a pond or swamp, which sinks into the top soil and struggles through it, following no defined channel, is deemed by the law absolutely to belong to the owner of the land upon which it is found, for the avowed purpose of enabling him to cultivate his land by controlling or draining it off in the manner most convenient to him…

5 R.I. at 253. Accordingly, Plaintiffs had the right to use their groundwater for their own purposes. Admittedly, state PWS regulations require that the groundwater not be contaminated, however, there is no evidence that Plaintiffs' groundwater was contaminated. Defendants admit the available evidence shows it was not. Further, RIDOH has never previously required what it required here, i.e., that proof that there was no possibility that the applicant's groundwater could be contaminated by a neighbor regardless of whether the neighbor's groundwater was contaminated.

In Cedar Point Nursery, the Court addressed a NLRB regulation that granted union organizers the right to enter plaintiffs' land for three hours a day, 120 days a year. In that case, the Court considered its precedent on government-induced flooding of land and whether it was a trespass or a taking. 594 U.S. at 160, citing Arkansas Game and Fish Commission v. U.S., 568

U.S. 12, 38 (2012). The Court commented that on remand of that decision the that Federal Circuit had held that the government had effected a physical taking in the form of a temporary flowage easement. Id. citing Arkansas Game and Fish Comm'n v. U.S., 736 F.3d 1364, 1372 (2013). The Court went on to hold that the NLRB regulation was a physical taking because it denied the property owners the right to exclude the organizers from their land. Id. at 162. Similarly, in Loretto, the Court held that a New York statute requiring landlords to permit cable companies to install cable equipment on their properties was a physical taking. 458 U.S. at 441.

The Hendler decision is particularly relevant. In that case, the plaintiffs owned or held property as trustees in Riverside County, California. There was a toxic waste site near their property that was subsequently declared a Superfund site after a local water quality board had determined that toxic chemicals from the site had seeped into the aquifer below it. Electromagnetic conductivity testing indicated that a plume of contamination emanating from the site appeared under the plaintiffs' property. The EPA issued an order compelling plaintiffs to allow EPA and state officials to drill three monitoring wells on their property. The EPA and state officials ultimately placed twenty monitoring wells on plaintiffs' property over the course of three years. Those officials periodically entered the property to monitor the groundwater. By all accounts, the site cleanup with which the monitoring wells were associated was very successful. The property owners filed suit alleging a taking and moved for summary judgment on their claim. The trial court denied their motion.

On appeal, the Federal Circuit said: "A physical occupation of private property by the government which is adjudged to be of a permanent nature is a taking, and that is true without regard to whether the action achieves a permanent public benefit or has only a minimal economic

13

impact on the owner." Id. at 1375. It added: "In this context, 'permanent' does not mean forever, or anything like it. A taking can be for a limited term…" Id. at 1376. It continued:

> The evidence before the [trial] court…reflected a situation in which the Government behaved as if it had acquired an easement…Pursuant to the easement, the Government at its convenience drove equipment upon plaintiffs' land for the purpose of installing and periodically servicing and obtaining information from the various wells it had located there…It is a taking of the plaintiff's right to exclude, for the duration of the period in which the wells on are the property and subject to the Government's need to service them.

Id. at 1378. The Federal Circuit concluded this part of its decision by stating:

> We emphasize that the issue is *not* whether the Government had the right to impose itself and its activities on these plaintiffs. Whatever right the plaintiffs had to be let alone was overcome by the Government's need in the interest of public health and safety to monitor the ground water contamination. Indeed, plaintiffs expressly concede the point.
>
> The issue before the [trial] court…was whether on the facts before it, the Government took any property by permanent physical occupation, thus obligating it to pay plaintiffs just compensation…The trial judge denied plaintiff's motion for summary judgment on this point; he should have granted it. (emphasis original).

Id.

It is clear that imposition of an easement constitutes a physical taking. Tennessee Gas Pipeline Co. v. 104 Acres of Land More or Less in Providence County of the State of Rhode Island, 780 F.Supp. 82 (D.R.I. 1991) (assessing damages for the condemnation of a pipeline easement pursuant to the Natural Gas Act). Courts have held that a property owner subjected to an easement is entitled to compensation for the difference in the value of the land caused by the easement. They have not considered the additional factors set forth for a regulatory taking. See, e.g., Dugan v. Rank, 372 U.S. 609, 625 (1963) (applying California law) ("[W]hen the Government acted here 'with the purpose and effect of subordinating' the respondents' water rights to the Project's uses 'whenever it saw fit,' 'with the result of depriving the owner of its profitable use (there was) the imposition of such a servitude (as) would constitute an appropriation of property for which

14

compensation should be made.'"), quoting, Peabody v. United States, 231 U.S. 530, 538 (1913); United States v. 329.73 Acres of Land, Situated in Grenada and Yalobusha Counties, State of Mississippi, 666 F.2d 281 (5th Cir. 1982).

This is an analogous situation. Here, RIDOH is concerned that Wright's junkyard might be contaminating the groundwater, despite a lack of evidence that this is actually occurring. However, instead of entering Plaintiffs' land and conducting the testing themselves (or asking RIDEM to do it or requiring Wright's to demonstrate that it was not contaminating the groundwater), Defendants demanded that Plaintiffs fund and conduct an expensive investigation into that possibility, (despite the lack of concern by the state agency authorized to regulate Wright's, i.e., RIDEM). In sum, instead of taking an easement on Plaintiffs' land to investigate its concern, Defendants attempted to require Plaintiffs to do the testing to avoid paying Plaintiffs the appropriate compensation required by the Takings Clause. Put differently, Defendants speculate that Wright's is contaminating the groundwater, and that the groundwater is flowing towards the Legend's Creek property. Instead of requiring Wright's to remediate the situation, Defendants essentially give it an easement on the Legend's Creek property to continue doing so. In other words, it is a taking in violation of the Fifth Amendment for which the Fourteenth Amendment provides a remedy against the State.

Alternatively, conditioning Plaintiffs' PWS permit on a requirement that they undertake an expensive and logistically difficult groundwater monitoring and testing program to disprove that Wright's may be contaminating Plaintiffs' groundwater constitutes an unconstitutional condition. See, Koontz v. St. Johns River Water Management District, 570 U.S. 595, 612 (2013). In Koontz, plaintiff purchased a 15-acre parcel of land in Florida. He proposed to develop about 4 acres of it and to deed a conservation easement on the rest to the local water management district.

The district made two alternative responses, one of which would have limited his development to one acre and the other of which would have permitted him to proceed as he suggested if he also agreed to hire contractors to make improvements to land the district owned several miles away. The Florida state courts generally upheld the district's requirement.

The Supreme Court commented that in several contexts it had applied the unconstitutional conditions doctrine "that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." Id. at 604, citing, Lingle 544 U.S. at 547. The Court said its precedent "allow[s] the government to condition approval of a permit on the dedication of property to the public so long as there is a 'nexus' and a 'rough proportionality' between the property that government demands and the social costs of the applicant's proposal." Id. at 605-06. "[T]he government may choose whether and how a permit applicant is required to mitigate the impact of a proposed development, but it may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts." Id. at 606. The Court also rejected the argument that the district's condition was permissible because it demanded the expenditure of money instead of a transfer of land. Id. at 612.

Here, there is no question that Plaintiffs drilled a well into their groundwater that produced potable water. RIDOH does not dispute that. The well is 538 feet from the Wright's property. RIDOH agrees that there is no potential source of contamination within 200 feet of the well. Ferrari says the well's recharge zone is less than 200 feet, more like 50 feet (or less). RIDOH does not dispute his calculation. Thus, there was little to no social cost to Plaintiffs' PWS application. Rather, RIDOH says it is concerned that Wright's might be contaminating its groundwater, and that groundwater might be flowing towards the Legend's Creek property, even though there is no

data showing that to be the case and RIDEM, the agency that regulates Wright's environmental issues has no similar concerns. However, instead of RIDOH conducting its own investigation on its own dime or asking RIDEM to do so or asking RIDEM to require Wright's to do so, it demanded that Legend's Creek do so as a condition of getting its PWS permit. And it enforced this demanding by saying for the very first time that its regulation allows it to deny an application within 1750 feet of a potential source of contamination regardless of the contrary evidence. There is no nexus or rough proportionality between Plaintiffs' attempt to use their potable groundwater to operate a kitchen on their property and Defendants' demand that they investigate whether Wright's may be contaminating its groundwater. Plaintiffs submit that this is an unconstitutional condition on their right to PWS permit where all the available evidence shows their groundwater is potable and, apart from speculation, there is no evidence it will be contaminated by Wright's.

Finally, Plaintiffs note that if Wright's Auto Salvage had been contaminating the groundwater that subsequently flowed under their property, they would have a cause of action against Wright's. R.I.Gen.L. § 46-12-21 ("Any person who shall negligently or intentionally pollute groundwater shall be liable to any other person who is damaged by that pollution."). But, by Defendants' own admission, there is no evidence, literally none, that this has happened. Obviously, any attempt to file such an action against Wright's would lack a legitimate basis. However, Defendants assumed that Wright's is polluting the groundwater with some unknown contaminant with no evidence, based on mere speculation, that this may be the case. Further, Defendants assumed that Wright's groundwater was flowing towards Plaintiffs' property with no evidence of that. This has deprived Plaintiffs of substantial lost profits as well as significant appreciation in the value of the land because they could not use their groundwater as they wanted. Plaintiffs have no remedy the loss of the use of their groundwater other than this action for a taking.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment on liability with respect to Count I of the Amended Complaint alleging a physical taking of their property.

Respectfully submitted,

**LEGEND'S CREEK LLC, JON RESTIVO and ADEN MOTT, b**y their attorneys,

/s/ Thomas W. Lyons
Thomas W. Lyons         #2946
Rhiannon S. Huffman     #8642
Strauss, Factor, Laing & Lyons
One Davol Square, Suite 305
Providence, RI 02903
(401) 456-0700
tlyons@straussfactor.com

## **CERTIFICATION**

I hereby certify that on September 30, 2024, a copy of the foregoing was filed and served electronically on all registered CM/ECF users through the Court's electronic filing system and served by mail on anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Thomas W. Lyons*
